IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 10, 2019 Session

## STATE OF TENNESSEE v. QUINTAVIOUS MONTEZ PATTON AND DONTE R. SWANIER

Appeal from the Criminal Court for Davidson County
No. 2015-B-865     Steve R. Dozier, Judge
_____

## No. M2018-01462-CCA-R3-CD
_____

A Davidson County jury convicted Quintavious Montez Patton of first degree felony murder, voluntary manslaughter, attempted especially aggravated robbery, and attempted aggravated robbery. The jury convicted Donte Ricardo Swanier of first degree felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. The trial court sentenced both Defendants to effective sentences of life in prison. On appeal, Defendant Patton: (1) challenges the trial court's admission of video evidence; (2) claims his right to a speedy trial was violated; and (3) seeks relief based upon the cumulative effect of the trial court's errors. Defendant Swanier appeals the trial court's admission of: (1) rap music; (2) Facebook posts; and (3) prior bad acts. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Nicholas McGregor, Nashville, Tennessee, for the appellant, Quintavious Montez Patton.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Donte R. Swanier.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jennifer M. Charles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from an attempted robbery resulting in the shooting death of the victim, Moises Zarate. The Davidson County grand jury indicted the defendants for first degree felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. The grand jury additionally charged Defendant Patton with first degree premeditated murder.

## A. Procedural History

On April 1, 2016, Defendant Swanier made a proffer to the police, implicating Defendant Patton in the robbery and shooting. The State sought severance of the cases in anticipation of Defendant Swanier testifying against Defendant Patton at the June 19, 2017 trial. A few days before the trial, Defendant Swanier recanted, claiming his identification of Defendant Patton as the shooter was false. The State then moved to consolidate the defendants' cases because the defendants were charged with felony murder of the same victim arising out of the same incident.

On June 21, 2017, Defendant Patton filed a motion to remain severed for purposes of speedy trial, requesting that the trial court allow his trial to proceed on July 17, 2017. Defendant Patton argued that the State should not be allowed to delay because the State's trial strategy had changed. The trial court denied the motion, consolidated the cases, and the defendants' trial was set for October 16, 2017.

## B. Trial

In March 2014, the victim lived at the residence of his brother, Marco Zarate, in Antioch, Tennessee. On the night of March 14, 2014, the brothers' cousin, Adran Zanarripa, stopped by the house to pick up toys to deliver to family in Mexico. When Mr. Zanarripa arrived at around 9:00 p.m., the victim went outside to help load the items into Mr. Zanarripa's truck, while Marco Zarate remained inside the house.

Mr. Zanarripa testified that he and the victim were moving items from the victim's red truck into Mr. Zanarripa's truck when he saw a man grab the victim around the neck. The man who grabbed the victim was black, approximately 5'11", had a thin build, and wore his hair in long dreadlocks. The man wore a knit cap that had a bill like a baseball cap and a handkerchief covering his face. Mr. Zanarripa described the man as "young." Mr. Zanarripa then saw another man who was pointing a gun at Mr. Zanarripa, ordering him not to move. This man was also black but lighter-skinned than the man who grabbed the victim. He also wore a handkerchief over his face and was young and thin. Mr. Zanarripa turned and ran into Marco Zarate's house yelling that they were being robbed and then heard gunfire. Upon hearing the gunfire, he turned and ran back outside to the victim.

Still inside the house, Marco Zarate heard "some yelling" about a robbery and "shouts of terror." Marco Zarate testified that he looked out the bedroom window and saw gunfire before closing the curtain quickly to avoid detection. Marco Zarate said he was unable to see the shooter well because it was night and the person wore dark clothing. Marco Zarate ran downstairs and outside to where he found the victim lying on the ground. The victim was still breathing, but his breathing was labored. Marco Zarate called 911 at approximately 9:30 p.m. to request an ambulance. During the phone call to 911, Marco Zarate gave the phone to Mr. Zanarripa who provided a description, consistent with his testimony, about the suspects. The victim died before the ambulance arrived.

A neighbor, Sherrie Robinson, recalled, on March 18, 2014, before 10:00 p.m., she heard something that she initially thought was a car backfiring. After the loud bang, she heard people screaming and yelling, which caused her to look out her window. She saw two people get into a silver or light-colored compact car and drive away.

Rayvon Walker, Defendant Patton's cousin, testified that, at the time of the shooting, he was sixteen-years-old and on spring break from high school. On Tuesday, March 18, 2014, Defendant Patton called Mr. Walker and said that he wanted to "hang out." Defendant Patton arrived at Mr. Walker's house with Defendant Swanier, whose nickname was "Savage," and Defendant Patton's girlfriend, Diana Reyes.[1] The foursome left Mr. Walker's house in Defendant Swanier's silver car. Mr. Walker was unsure of the make of the car but guessed that it might have been a Hyundai. Mr. Walker recalled that he wore a black "Georgia hoodie" and some khaki pants. Mr. Walker also brought with him another set of clothing that included a black North Carolina hooded sweatshirt and a pair of black pants.

Mr. Walker testified that they drove to a car wash. He identified a photograph of Defendant Patton, Defendant Swanier, and Ms. Reyes at the car wash. In the photograph, Mr. Walker wore the Georgia sweatshirt consistent with his earlier description of his clothing. Ms. Reyes wore a pair of white rimmed sunglasses "with tint." Mr. Walker said that Defendant Swanier remained in the same clothing all day. Mr. Walker confirmed that he wore his hair in dreadlocks at the time of the shooting. Mr. Walker said that Defendant Patton also wore his hair in dreadlocks but that his dreadlocks had been shorter than Mr. Walker's and a portion died "[y]ellowish blond."

---

[1] The transcript and motions in the record spell Diana Reyes's name differently. For purposes of consistency, we spell the name "Reyes" as it is spelled in Defendant Patton's pre-trial motions.

Mr. Walker testified that the group drove to four different locations that day, one of which was a Shell gas station. The State played surveillance video obtained from the Shell gas station and asked Mr. Walker to identify the defendants in the video. Mr. Walker noted that Defendant Swanier was "a stalkier heavier guy" than Defendant Patton. The video showed Defendant Swanier pull in at a gas station, and Defendant Swanier and Defendant Patton exit the vehicle and walk into the Shell gas station. Defendant Swanier stood in line to pay for gas while Defendant Patton walked around the store and then exited with Defendant Swanier when he was finished paying. The video showed the defendants return to the car where Defendant Patton entered the front passenger side of the car, and Defendant Swanier pumped gas into the car. The men were dressed consistently with what they had been wearing in the car wash photographs. Mr. Walker explained that he and Ms. Reyes remained in the vehicle while the defendants went into the gas station.

Mr. Walker testified that next they drove to a K-Mart where all four went inside. The time stamp on K-Mart surveillance video footage showed the date as March 18, 2014, and the time as 6:48 p.m. Mr. Walker identified himself in still photographs taken from the surveillance video as the person wearing the Georgia hoodie. He also identified Defendant Patton, wearing gray, Defendant Swanier, wearing a red hat, and Ms. Reyes wearing the same white-rimmed sunglasses. The group then drove to Defendant Swanier's house.

At approximately 9:10 p.m., Defendant Swanier drove Defendant Patton, Mr. Walker, and Ms. Reyes to a Knights Inn Motel ("Knights Inn") located near Bell Road. Mr. Walker said that the idea to go to the Knights Inn was initiated by the defendants. Mr. Walker had changed into the North Carolina sweatshirt and black pants and wore a black bandanna, which had been given to him by Defendant Patton, over his face and the white-rimmed sunglasses earlier worn by Ms. Reyes. Defendant Patton also wore a black bandanna. Defendant Patton left his cell phone with Ms. Reyes and then he and Mr. Walker exited the vehicle nearby the Knights Inn. The State played surveillance video from the Knights Inn, and Mr. Walker identified himself and Defendant Patton on the video wearing clothing consistent with his testimony. The time stamp on the recording is March 18, 2014, at 9:10 p.m. The men returned from the Knights Inn and got into Defendant Swanier's car where they exchanged clothing so that Mr. Walker wore his Georgia hoodie while Defendant Patton wore the North Carolina hoodie and black pants. Mr. Walker recalled that he also wore a skull cap.

Mr. Walker testified that a plan developed to commit a robbery, but he could not recall who initiated the idea. At around 9:20 p.m., Defendant Swanier drove to a neighborhood where Defendant Patton and Mr. Walker were to rob someone with the use of Defendant Swanier's gun. Mr. Walker explained that Ms. Reyes had run away from

home so the defendants wanted to steal money to pay for a motel room for a place to stay. Mr. Walker denied seeing any of the group drinking or using drugs during the time leading up to the robbery.

Mr. Walker testified that they saw two Hispanic men standing by a vehicle in a yard, and Defendant Patton quickly developed a plan to use the gun to get the two men on the ground. Mr. Walker exited the vehicle with the hoodie over his head, still wearing the skull cap underneath and his dreadlocks "down." Mr. Walker said that he ran over and "grabbed the first person," the victim, and the two men began "tussling." Defendant Patton ordered the victim to let Mr. Walker go, but the victim did not comply, so Defendant Patton shot the victim. Defendant Patton and Mr. Walker then ran back to Defendant Swanier's car.

Upon further questioning, Mr. Walker added that, when they first approached the men in the yard, he ran toward the victim while Defendant Patton ran toward Mr. Zanarippa, the other man standing in the yard. He said that Defendant Patton fired only one shot and that after the victim was shot, Mr. Zanarippa ran to the victim. Mr. Walker said that he did not touch either of the cars at the house with his bare hands and that both he and Defendant Patton wore gloves at the time of the attempted robbery.

Once back inside the vehicle, the men told Defendant Swanier about what had occurred and returned the gun to him. Defendant Swanier drove to the Knights Inn. Mr. Walker identified a clip of surveillance video from the Knights Inn showing the date and time as March 18, 2014, at 9:48 p.m. The footage showed Defendant Swanier entering the lobby of the Knights Inn and renting a room. He was dressed consistently with the surveillance footage from the other locations on the day of the shooting. Mr. Walker stated that after Defendant Swanier rented a room for the night, they drove to an O'Charley's restaurant where Defendant Swanier "got out of the car for something," then they drove to Liquor World where Ms. Reyes stole a bottle of liquor. The group went to a McDonald's restaurant before returning to the Knights Inn. Mr. Walker did not recall Defendant Swanier leaving the Knights Inn again, but he agreed that the surveillance video showed Defendant Patton, Ms. Reyes, and Mr. Walker going into the motel complex and Defendant Swanier's vehicle driving away. Defendant Swanier's vehicle returned at around 10:05 p.m.

Mr. Walker testified that, the following morning, Defendant Swanier drove him home. Mr. Walker returned to school the following Monday and tried not "to think about it." On May 9, 2014, however, Detective Chad High came to Mr. Walker's school and asked to speak with him. During the interview, Mr. Walker told the police officer that Defendant Patton shot the victim, and Defendant Swanier drove and supplied the gun. The recording of this interview was played for the jury. Mr. Walker returned to class that

day but was later arrested on May 29, 2014, and transported to the east Nashville detention center. Several days after Mr. Walker's arrest, Defendant Patton arrived at the detention center. Mr. Walker stated that he did not have any contact with Defendant Patton initially but eventually they communicated.

On June 6, 2014, Mr. Walker provided another statement to the police, again identifying Defendant Patton as the shooter and Defendant Swanier as the driver and the provider of the weapon. Mr. Walker stated that he pleaded guilty to facilitation of felony murder and agreed to testify truthfully against the defendants.

Mr. Walker testified that in 2016, he was at the community center for a baby shower being held for his girlfriend. Mr. Walker had not invited Defendant Swanier to the baby shower, but Defendant Swanier and another man showed up in a truck. Both men kept their hands in their pockets, causing Mr. Walker to feel "nervous." Defendant Swanier told Mr. Walker he was out of jail on bond and that Mr. Walker had "better not [go] to court snitching." Mr. Walker said that he agreed with whatever Defendant Swanier said out of fear for the safety of his girlfriend and family present at the baby shower.

Mr. Walker testified that Defendant Patton had called him on Valentine's Day and advised him to "plead the 5th" when he came to court to testify. The State played a recording of the phone call and distributed a transcript of this recorded conversation. Mr. Walker reaffirmed his identification of Defendant Patton as the shooter and stated that his testimony had been truthful.

Lakesha Chambers, Mr. Walker's aunt, testified that she had raised Mr. Walker since he was two years old. Ms. Chambers explained that she had two sisters, Mr. Walker's mother, LaResha Walker, and Defendant Patton's mother, Shameka Patton. Ms. Chambers confirmed that, prior to March 2014, she and her sister Shameka Patton had shared a close relationship. She confirmed that Defendant Patton and Mr. Walker grew up playing together but said that the two cousins had spent less time together as they became older. Ms. Chambers was unaware that Mr. Walker was spending the day with Defendant Patton on March 18, 2014. The following day when Mr. Walker returned home, Ms. Chambers did not notice anything "unusual" about Mr. Walker, and he mentioned nothing about the events of March 18.

Ms. Chambers recalled that on May 27, 2014, Shameka Patton came to Ms. Chambers' house, which was unusual. Ms. Patton told Ms. Chambers that she was in the area to "work out" and then went to the bathroom. Ms. Chambers remained in the kitchen cooking. When Ms. Patton did not return after a period of time, she went to look for Ms. Patton and found Ms. Patton sitting at the foot of Mr. Walker's bed and Mr.

Walker sitting up in bed crying. She asked Mr. Walker why he was crying, and he replied, "just know me and [Defendant Patton] going to jail for a long time." Ms. Chambers was puzzled by his response and surprised that her sister would go to Mr. Walker's room without telling her.

The parties stipulated that the Metropolitan Nashville Police Department ("MNPD") had obtained a warrant on March 7, 2014, allowing the police to place a GPS tracking device on Defendant Swanier's 2002 silver Hyundai Elantra. Through Davidson County Sheriff's Office employee Linda Griffin, the State also introduced phone records from MCC (Maximum Correctional Center) where Defendant Patton was housed on February 14, 2017. The records are consistent with Mr. Walker's testimony about Defendant Patton's phone calls to him from jail.

MNPD Detective Joseph High testified that he responded to a call about a shooting in Antioch, Tennessee. After gathering information at the crime scene and speaking with the victim's brother, Marco Zarate, he returned to the police precinct and interviewed Mr. Zanarripa, the victim's cousin. After speaking with Mr. Zanarripa, Detective High determined that the police were looking for two suspects. Detective High attended the autopsy of the victim and learned that one projectile was recovered from the victim's right chest cavity.

Detective High testified that on the afternoon of March 19, 2014, he received information from the Hermitage Precinct about possible suspects. The information related to a GPS tracker that officers at the Hermitage Precinct had been monitoring. Detective High recalled that police officers had placed a GPS tracker on Defendant Swanier's 2002 silver Hyundai at around 6:30 p.m. on March 18, 2014, while the vehicle was parked in a parking lot on Murfreesboro Road near Edgehill. At this point in Detective High's testimony the trial court declared Detective High an expert in the field of mobile device call detail record analysis and analysis of GPS devices. Detective High then explained to the jury how the police monitored a tracking device. Detective High identified records containing data retrieved from the GPS tracking device placed on Defendant Swanier's vehicle.

Based upon these records, Detective High testified that Defendant Swanier's vehicle was within eighty yards of the address where the victim was shot at 9:25 p.m. on March 18, 2014. This information was consistent with Ms. Robinson's statement to the police that she had seen a silver Hyundai leave the scene at a high rate of speed around the same time. Detective High confirmed that the police used the data retrieved from the GPS tracking device and information gathered in interviews to follow the movements of the vehicle to various locations leading up to the crimes. Detective High then obtained surveillance videos from those locations confirming the defendants' presence at those

locations. Detective High testified that the first location was a Shell gas station. The surveillance video showed Defendant Swanier's vehicle arrive at approximately 6:22 p.m. and remain at the gas station for between five to ten minutes.

Detective High testified that the group next went to a K-Mart located on Murfreesboro Road. Surveillance video showed that both defendants, Mr. Walker, and Ms. Reyes were dressed the same as they were at the Shell gas station. All four went into the K-Mart, remained there briefly, and then exited at 6:53 p.m. After the K-Mart stop, GPS tracking data indicated that the vehicle was located in an area off Bell Road until around 7:40 p.m. Upon leaving this area, police tracked Defendant Swanier's vehicle driving down Bell Road to Murfreesboro Road to I-24. Detective High created an animation of the vehicle's movement, which the State played for the jury. The vehicle remained in an area near a Home Depot located near Cane Ridge Road until around 9:08 p.m. Detective High noted that the vehicle was in the area of an access road that runs near the Home Depot and that there was a storage unit and a Knights Inn in the area behind the Home Depot.

Based upon this information, Detective High obtained surveillance footage from the Knights Inn. The surveillance video from March 18, 2014, at around 9:11 p.m. showed Defendant Swanier's vehicle. The GPS tracking data indicated that the vehicle then drove down Bell Road to Blue Hole Road and eventually to Antioch Pike. Defendant Swanier's vehicle then entered the area of the shooting at around 9:20 p.m. The vehicle remained in the area of the shooting for less than ten minutes. Detective High noted that the victim's brother called 911 about the shooting at 9:31 p.m. According to the GPS tracking data, Defendant Swanier's vehicle then returned to the area around the Knights Inn. Based upon this information, Detective High obtained surveillance video from a Thorntons, a Mapco, and a Liquor World, all located along Bell Road.

As part of the investigation, Detective High sought a warrant for the call detail information for Defendant Swanier's, Defendant Patton's, and Mr. Walker's cell phones. The cell phone records showed locations consistent with the GPS tracking data and the surveillance videos. Detective High narrated a Power Point presentation of the call detail records. Detective High confirmed that the GPS tracking data indicated that at 10:10 p.m. Defendant Swanier's vehicle was near an O'Charley's restaurant in the area of Bell Road and Mount View Road. The GPS tracking data showed Defendant Swanier's vehicle drove to a parking lot in the vicinity of Liquor World and a McDonald's restaurant. Video surveillance footage obtained from Liquor World showed Ms. Reyes inside the Liquor World dressed in the same clothing seen in the K-Mart surveillance video. Detective High testified that surveillance video showed Defendant Patton with Ms. Reyes, and Defendant Swanier's vehicle sitting in the northwest corner of the

parking lot. The GPS tracking data showed the vehicle traveling to the Knights Inn area from 10:30 to 10:40 p.m. The surveillance video footage from the Knights Inn was consistent with the GPS tracking data. The Knights Inn surveillance video showed Defendant Patton, Mr. Walker, and Ms. Reyes walking through the parking lot at 10:40 p.m. before Defendant Swanier's vehicle drove away. Surveillance video footage from a Thorntons Gas Station at 10:48 p.m. showed Defendant Swanier at the Thorntons located at Eagle View and Bell Road before returning to the Knights Inn for the night.

Detective High obtained surveillance footage for the following morning, March 19, 2014, which showed the defendants, Ms. Reyes, and Mr. Walker leaving the Knights Inn at 11:03 a.m. Detective High noted that the surveillance video showed a blond "patch" of hair visible at the top of Defendant Patton's hair, similar to Defendant Patton's appearance at the time of his arrest. Detective High stated that, during the course of his investigation, he learned that Ms. Reyes was "listed as a run away." Detective High stated that Mr. Walker was arrested for the victim's death on May 28, 2014, Defendant Patton on June 9, 2014, and Defendant Swanier in June or July. He recalled that Defendant Swanier was later released on bond.

Throughout the course of his investigation, Detective High learned that Defendant Swanier went by the nickname "Savage." Detective High testified that he reviewed the January 17, 2017 Facebook post on Defendant Swanier's Facebook page. He identified the photograph that was the subject of the post, an album cover for "D-Savage." It depicts a handcuffed arm with tattoos holding a gun. In the lower right hand corner, it reads "Sorry 4 the Case." Detective High confirmed that Defendant Swanier had tattoos extending to his wrist, as did the person depicted in the album photograph. On June 18, 2017, while out on bond, Defendant Swanier also posted to Facebook a rap music video entitled "Another Juug." The video showed a man that looked like Defendant Swanier holding a pistol with an extended magazine clip. The following lyrics were provided to the jury in the form of a transcript and the rap video was also played:

Detectives had me on the news
Talking about murder and robbery
Murder and robbery
Rob a nigga and for what
You know a nigga is a prodigy

Detective High confirmed that, at the time of Defendant Swanier's arrest, detectives had appeared in news reports talking about the attempted robbery and murder.

Thomas Deering, the Nashville Deputy Chief Medical Examiner, testified as an expert witness in the field of forensic pathology. Dr. Deering testified that he did not

perform the autopsy on the victim but that he had reviewed all of the materials associated with this case. Dr. Deering testified that the victim bled to death as a result of gunshot wounds to the arm and chest and the manner of death was homicide. Dr. Deering said that the external examination of the victim revealed five gunshot wounds, four to the left arm and one to the chest. Based upon the examination of each of the wounds, it appeared all wounds were caused by one bullet entering, exiting and then re-entering the body twice.

After the State's case-in-chief, Defendant Patton elected not to offer any evidence, and Defendant Swanier offered the testimony of two witnesses. Breion Dixon testified that he worked in the music industry and recalled doing a video shoot on November 11 but he did not state the year. He provided a flier that he had produced and circulated inviting the public to attend the video shoot and specifically recalled that Defendant Swanier was present. Mr. Dixon reiterated that he was sure that Defendant Swanier "was at the one across the street from Morgan Park." Marcus Hemphill testified that he accompanied Defendant Swanier to the video shoot. When they arrived, they saw Mr. Walker. Mr. Walker and Defendant Swanier approached each other, and Mr. Walker "nodded and kind of spoke softly and said, yeah, I will . . . go to court and tell truth." Mr. Hemphill denied that Defendant Swanier told Mr. Walker not to "snitch" but agreed that Defendant Swanier told Mr. Walker to "tell the truth."

Based upon this evidence, the jury convicted Defendant Patton of first degree felony murder, voluntary manslaughter, attempted especially aggravated robbery, and attempted aggravated robbery and Defendant Swanier of first degree felony murder, attempted especially aggravated robbery, and attempted aggravated robbery. As to each defendant, the trial court imposed life sentences for the first degree felony murder convictions, with the remaining sentences to be served concurrently with the life sentences. It is from these judgments that the defendants appeal.

## II. Analysis

On appeal, Defendant Patton: (1) challenges the trial court's admission of video evidence; (2) claims his right to a speedy trial was violated; and (3) seeks relief based upon the cumulative effect of the trial court's errors. Defendant Swanier appeals the trial court's admission of: (1) rap music; (2) Facebook posts; and (3) prior bad acts.

### A. Admission of Evidence

On appeal, both defendants challenge the trial court's admission of various pieces of evidence. Defendant Patton asserts that the trial court erred when it admitted surveillance video from the Knights Inn and from the Shell gas station. Defendant

Swanier claims error as to the Knights Inn surveillance video and additionally challenges the admission of the Liquor World surveillance video, his Facebook post depicting his album cover, and a portion of his rap song.

## 1. Knights Inn Surveillance Video

The defendants argue that the trial court erred when it admitted the first video footage from Knights Inn showing two men approaching the lobby and then turning and fleeing. The defendants argue that the trial court improperly analyzed the evidence under Tennessee Rule of Evidence 403 rather the more restrictive 404(b) test. The State responds that the trial court properly analyzed this evidence under both Tennessee Rule of Evidence 403 and 404(b) and concluded that the video was admissible.

The State asserts that Defendant Swanier has waived review for failure to raise a timely objection to the surveillance video. In 2017, the State filed a notice of its intent to introduce evidence which could be considered a prior bad act under Tennessee Rule of Evidence 404(b). Both the State's notice and the subsequent hearing on the motion were after the defendants' cases had been severed in anticipation of Defendant Swanier being a State witness at Defendant Patton's trial. On appeal, the State correctly notes that due to the severance, Defendant Swanier was a witness, not a party to the hearing and, therefore, lodged no objection to the evidence. Thereafter, however, Defendant Swanier recanted his statement, and the defendants' cases were consolidated for trial. There is no record of Defendant Swanier raising an objection to the admission of the Knights Inn video once the cases were consolidated; however, he included the issue in his motion for new trial. We agree with the State that Defendant Swanier risks waiver. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") Based upon the record before us, however, we choose to review the issue as it pertains to both defendants.

As previously stated, the State filed a pre-trial notice of its intent to offer evidence pursuant to Tennessee Rule of Evidence 404(b). The State argued that the video was relevant to prove identity. The men approaching the Knights Inn and then running out of the frame are dressed in clothing consistent with Mr. Walker's statement to the police. Furthermore, the time stamp on the video was 9:09 p.m., placing Defendant Patton in the area with Mr. Walker shortly before the shooting. The State argued that the video corroborated Defendant Swanier and Mr. Walker's version of the events which included Defendant Swanier as the driver while the other two men approached the victims. The State noted its intention to use the video for identity purposes only and there was no plan "to mention the uncharged criminal behavior."

At the hearing, Defendant Patton's attorney conceded that identity "could be an issue" as it related to the specific roles during the crimes and that height, weight, and clothing descriptions "would be relevant." At the conclusion of the 404(b) hearing, the trial court found the video admissible and made the following findings:

> [E]ven if you assumed that the jury took [Defendant Patton]'s perspective that they may assume what happened, which I don't think you can do, but so first of all I don't think that it is evidence of other crimes, wrongs or acts, but it is more of an issue of is it relevant proof and obviously it is based on the Court's discussions here in terms of who is with who, is it corroborative of Mr. Walker or [Defendant Swanier]'s testimony as to who all was doing what that evening, who was driving? Yes. This few minutes before this homicide obviously is relevant, probative proof not substantially outweighed by any unfair prejudice.
>
> If under 404(b) which has a different weighing process you were to think from [Defendant Patton]'s perspective well the jury might think they are up to something, it's still not being offered as a character trait of [Defendant] Patton. It's being offered for purposes of a highly material issue, identity, and corroborative proof about whose driving, who's doing what, who is wearing what clothing and that identity, obviously, is pertinent to the State's having to prove that obviously in the murder trial, so even assuming that might be viewed as evidence of other crimes or wrongs, which it is not, then it is still the Court's analysis that that probative value is outweighed by any danger of unfair prejudice.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent and the identity of the defendant. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004).

Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court held a hearing on the Rule 404(b) evidence outside the presence of the jury. After hearing the evidence, the trial court found identity was the material issue other than conduct conforming with a character trait. At the time of the hearing, the State had two accomplices, Mr. Walker and Defendant Swanier, whose anticipated testimony at trial would require corroboration. The State was also required to prove identity of the shooter. Evidence that Defendant Patton was with Mr. Walker shortly before the shooting while Defendant Swanier served as a getaway driver is proof of Defendant Patton's identity as the perpetrator of the first degree murder.

Although the trial court did not expressly find that the proof was clear and convincing, the video evidence allows for little question about the validity of the proof. In this respect, we find that the trial court substantially complied with Rule 404(b) and the nature of the submitted evidence provides sufficient validity even absent a specific finding by the trial court that the evidence was "clear and convincing." *See State v. Clark*, 452 S.W.3d 268, 291 (Tenn. 2014) (trial court did not "expressly state" that evidence was "clear and convincing," however, the defendant's repeated admission to conduct supported a "clear and convincing" finding); *State v. Ray Anthony Nelson*, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App, at Knoxville, Sept. 9, 1998) (holding trial court substantially complied with Rule 404(b) even though trial court did not specifically make a finding that the proof was clear and convincing).

The trial court acknowledged that the evidence was prejudicial but found that it was "highly" probative as to identity. The surveillance video: (1) corroborated Mr.

- 13 -

Walker's trial testimony, (2) provided a consistent description of what the men were wearing a short time before the shooting, and (3) showed Mr. Walker and Defendant Patton approaching the motel while Defendant Swanier remained in the vehicle, all of which is proof of the defendants' involvement in the crimes at issue. Because the State had the burden of proving beyond a reasonable doubt the identity of the defendants and corroborating the accomplice testimony, we conclude that the trial court did not err in finding the probative value of the evidence was not outweighed by the danger of unfair prejudice.

The defendants argue that the trial court improperly reviewed the evidence under the 403 standard, rather than the more restrictive 404(b) standard. In our view, the trial court reviewed the evidence under both standards. The trial court did not find that the act of wearing a bandanna and walking up to a motel was criminal or a prior bad act. The conduct is at best suspicious, and our supreme court has determined that only prior bad acts implicate 404(b). *See State v. Reid*, 213 S.W.3d 792, 813-14 (Tenn. 2006) (finding that handgun possession is not a bad act that warrants Rule 404(b) analysis). Nonetheless, the trial court also reviewed the evidence in light of 404(b), concluding that it was admissible under a 404(b) analysis. We agree with the trial court.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting the surveillance video from the Knights Inn. The defendants are not entitled to relief as to this issue.

## 2. Shell Gas Station Surveillance Video

Defendant Patton asserts that the trial court improperly admitted surveillance video from a Shell gas station on the day of the crimes, showing him "stealing a bottle." The State responds that Defendant Patton has waived this issue.

At trial, the State showed a surveillance video from a Shell gas station during Mr. Walker's testimony. After the video was shown, the following exchange occurred between Defendant Patton's attorney, the trial court, and the State:

[Defense Counsel]: There is a video that hasn't been placed into evidence yet and it's one of the convenience stores and I have watched it now just on the big screen, and it looks like maybe [Defendant] Patton is concealing items and I was going to see if that could be redacted.

THE COURT: One that hasn't been played?

- 14 -

[Defense Counsel]    It was played, it wasn't moved into evidence.

THE COURT:    One that has already been played.

[Defense Counsel]    Yes, and I saw it --

THE COURT:    Yeah, I mean he stole a bottle of water, do you think that's going to be some major issue?

[Defense Counsel]:    I don't know and it's not -- but I mean I -- and I'm not even sure that he stole it, but when I watched it this time with a height[ened] sensitiv[ity] I thought --

THE COURT:    It doesn't show him going by the -- I mean, I don't know.

[Defense Counsel]:    Particular[ly] if it's only being used for identity and time stamp.

THE COURT:    I mean, we've got three video clips from various places shown.  We've watched them and seen clothing and -- who is the State wanting to have those introduced through?

[State]:    Detective Chad High, Your Honor.

THE COURT:    Okay.  Do you care to be heard on the bottle of water that went into the restroom and wasn't seen again?

[State]:    It's already been played for the jury.   I mean, redactions -- we are not going to make redactions at this point.  That could have been done before trial.  I mean, you had all of the video.

[Defense Counsel]:    And I knew I was going to have to answer that question.  When I get these, they are on a mosaic and I have to watch them on a special computer and it just wasn't as apparent as it was on a full screen.  And it's one of those things where the [ ] purpose of it should be just identity and the time.

- 15 -

THE COURT:        Well do you think – I don't know what the whole purpose of it is.  But --We've --

[Defense Counsel]:  Well, it shouldn't be to show that he's concealing water.

THE COURT:        We've seen them in K-Mart.  We've seen them in Shell.  We've seen them in [K]nights --

[Defense Counsel]:  If he is it just doesn't – that's the things too, it's not even clear where it goes.  But you can see -- my worry is that the jury goes back there and --

THE COURT:        I mean, no one – they aren't going to argue that, so it doesn't -- we don't know if he took it or didn't take it, so I mean, it's already been shown, it hasn't been officially moved to be introduced.

[Defense Counsel]:  That's why I said, shown and exhibits are kind of two different animals because an exhibit they can watch as often as they want as much as they want.  Shown is something that they don't get to refresh [their] memory on.

THE COURT:        Okay.  So the State wants to make that an exhibit, have this to be a potential issue versus introduce some still shots from the Shell station for whatever purpose you want that to be used for?

. . . .

[State]:           Well, number one, I don't think a contemporaneous objection has been lodged, so I think that issue would be [wai]ved.

THE COURT:        Well it's being lodged now and it's not been made an exhibit.

[State]:           Well, I can see if Chad High can redact it.  You will need to get me the exact minute and second that you

- 16 -

want redacted and you will need to e-mail that to me. Are there any other redactions that [ ] you want?

[Defense Counsel]: Is Chad High going to testify today?

[State]: I have no idea.

[Defense Counsel]: Okay.

THE COURT: Okay. I mean, it's just -- I don't know when you can even -- you can look at it and see when he went into the restroom and when he came out.

[Defense Counsel]: Your Honor, are we going to take an afternoon break, do you think, Judge?

THE COURT: Between now and like 6 o'clock?

[Defense Counsel]: Yes.

THE COURT: Yes.

[Defense Counsel]: Okay. I will be able to take a look and I will take care of it then.

THE COURT: Okay.


Based upon the record, it appears that the State did not redact the video that was provided to the jury during deliberation.

The relevant video shows Defendant Patton and Defendant Swanier entering the Shell gas station. Defendant Swanier stands in line to pay for gas while Defendant Patton wanders around the store. As evidenced by the above exchange, there is some question about whether Defendant Patton takes a bottle from the cooler. The video shows him reaching inside the cooler; however, it is hard to determine whether he actually takes an item from the cooler. He enters the bathroom, exits the bathroom and stands near the front area of the gas station waiting for Defendant Swanier. The two men exit together.

The defendants both possessed the surveillance video before trial and did not raise an objection to its contents. After the video was played, Defendant Patton's attorney

requested that a portion of the video be redacted. After some discussion, the State agreed to redact the objectionable portion of the video. No other objection was raised or remedy requested. The trial court granted Defendant Patton's request to redact the video. In Defendant Patton's motion for new trial he argues for the first time that the video violated a motion in limine he filed "to prevent testimony of [his] behavior and reputation." As to Defendant Swanier, the record does not reveal any objection by Defendant Swanier until his motion for new trial.

In most cases, the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal. *See* Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). This is because without a specific objection, the trial court has had no opportunity to avoid the error. *State v. Galloway*, 696 S.W.2d 364 (Tenn. Crim. App. 1985). Because the defendants did not object to the video offered by the State, the issue is waived. *See* Tenn. R. App. P. 36(a) (appellate relief is generally unavailable when a party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); *State v. Schieffelbein*, 230 S.W.3d 88, 118 (Tenn. Crim. App. 2007) ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal.").

### 3. Liquor World Surveillance Video

Defendant Swanier asserts that the trial court abused its discretion when it admitted video evidence of Diana Reyes stealing a bottle of liquor from Liquor World. The State responds that Defendant Swanier has waived our review of this issue because he did not raise a contemporaneous objection or include this issue in his motion for new trial. We agree with the State.

At trial, Mr. Walker testified that Ms. Reyes went into the Liquor World and stole a bottle of liquor before the group went to a McDonald's restaurant. The State played surveillance video for the jury, showing Ms. Reyes pick up a bottle of alcohol and then walk outside the frame of the camera. GPS tracking data confirmed that Defendant Swanier's car was in the parking lot near the Liquor World at the time. Neither party objected to the introduction of the surveillance recording. This issue also was not raised in Defendant Swanier's motion for new trial.

Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App.1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532

- 18 -

(Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Tennessee Rule of Evidence 103(a)(1) also provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection." When a party does not object to the admissibility of evidence, the evidence becomes admissible, notwithstanding any other evidentiary rule to the contrary, and the jury may consider that evidence for its "natural probative effect as if it were in law admissible." *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981).

Furthermore, the Tennessee Rules of Appellate Procedure state that "no issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties, or counsel, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(d); *See e.g., State v. Mayo*, 735 S.W.2d 811, 816 (Tenn. Crim. App. 1987) (holding that the defendant waived an issue on appeal for failing to raise it in the motion for new trial); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial). Because Defendant Swanier did not challenge this issue in his motion for new trial or the hearing on the motion, he has waived this issue on appeal.

Having failed to preserve the issue, Defendant Swanier is limited to plain error review; however, Defendant Swanier has not established that consideration of the error is necessary to do substantial justice. *See State v. Thomas*, 158 S.W.3d 361, 413 (Tenn. 2005).

### 4. Facebook Posts

Defendant Swanier argues that the trial court abused its discretion when it admitted Facebook posts by him that were irrelevant and caused unfair prejudice. The State responds that the evidence – an album cover and a rap video – were properly admitted as admissions of guilt for the attempted robbery and murder.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn. Crim. App. 1978) (quoting *Ellison v. State*, 549 S.W.2d 691, 696 (Tenn. Crim. App. 1976)). We review a trial court's

admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Defendant Swanier filed a motion in limine to exclude any evidence of a video or song lyrics contained in a supplemental discovery response. At a hearing on the motion, the trial court found the album cover was admissible because it could be viewed as an admission or an apology for Defendant Swanier's involvement in the case, stating "it's referencing a case that he is sorry for, I mean, the trier of fact can determine whether it has anything to do with this case, but it could." The trial court stated that it was for the jury to interpret the "apology." As to the rap lyrics, the State offered to redact the lyrics and the trial court stated, "in terms of the lyrics on the CD I am not sure about, but if you want to submit that redacted version then I will watch and listen to it." At trial, defense counsel acknowledged that the trial court had ruled that the lyrics were admissible.

On appeal, Defendant Swanier argues that these items served no purpose other than to inflame the jury. We disagree. While prejudicial to Defendant Swanier, the rap lyrics and "Sorry 4 the Case" on the album cover are admissions of guilt. Mr. Walker testified that he knew Defendant Swanier by the name "Savage." The album posted on Defendant Swanier's Facebook page for "D-Savage" with the wording "Sorry 4 the Case" links the album to Defendant Swanier as the artist of the album. The rap lyrics referenced a robbery and murder that detectives talked about in the news. Detective High confirmed that there was media coverage of this attempted robbery and murder. This evidence had probative value as an admission by Defendant Swanier of participation in these crimes. Even were we to conclude that the trial court abused its discretion, any error would have been harmless in light of the State's extensive evidence - GPS tracking data, cell phone data, accomplice testimony - implicating Defendant Swanier in these crimes. Accordingly, we conclude that the trial court did not abuse its discretion when it admitted this evidence. Defendant Swanier is not entitled to relief.

### B. Speedy Trial

Defendant Patton claims that his right to a speedy trial was violated. Specifically, he claims that the State caused intentional delay to gain a tactical advantage over the defense. The State responds that the trial court properly denied the Defendant's claim for violation of his right to a speedy trial. We agree with the State.

The Sixth Amendment to the United States Constitution and the Tennessee Constitution provides a defendant with the right to a speedy trial. U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. The purpose of the right to a speedy trial is to protect defendants from "oppressive pre-trial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992).

In *Barker v. Wingo*, 407 U.S. 514 (1972), the United States Supreme Court developed a four-prong balancing test to determine whether a defendant has been deprived of the right to a speedy trial. The four factors to be considered are: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; (4) and the prejudice suffered by the defendant from the delay. *Id.* at 530. The delay must approach one year to trigger the *Barker* analysis, the line of demarcation depends on the nature of the case. *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997).

Defendant Patton was arrested on June 9, 2014, indicted on April 17, 2015, and the trial began October 16, 2017. This delay warrants a further examination of the specific circumstances of this particular case in light of the remaining three *Barker* factors. We would note, however, that this factor should not weigh heavily against the State; a three-year delay from indictment to trial is not excessive in light of other cases. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001); *See, e.g., Doggett*, 505 U.S. at 647 (six-year delay); *State v. Wood*, 924 S.W.2d 342 (Tenn. 1996) (thirteen-year delay); *State v. Ricky E. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057, at \*5 (Tenn. Crim. App., at Nashville, Feb. 10, 2009) (eight-year delay), *no perm. app. filed*.

The next factor to be considered is the reason or reasons for the delay. *Barker*, 407 U.S. at 531. The reasonableness of a delay depends on the complexity and the nature of the case. *Doggett*, 505 U.S. at 652. In *State v. Wood*, our Supreme Court identified four possible reasons for delay, they include:

(1) intentional delay for tactical advantage or to harass the defendant;
(2) bureaucratic indifference or negligence;
(3) necessary delay for the fair and effective prosecution of the case; and
(4) delay agreed to or caused by the defendant.

924 S.W.2d 342, 346 (Tenn. 1996). In this case, Defendant Patton contends that the delay was due to the State's intentional act to gain a tactical advantage over the defense. Defendant Patton asserts in his brief that "the state intentionally delayed [his] trial so they could rebuild the case against him." The State contends that the delays involved with this case were necessary for the fair and effective prosecution of the charges.

Our review of the record reveals that, according to trial testimony, Defendant Patton was arrested on June 9, 2014, and the record shows that the defendants were indicted on April 17, 2015. On April 1, 2016, Defendant Swanier made a proffer to the police, implicating Defendant Patton. Anticipating Defendant Swanier testifying at trial against Defendant Patton, the State requested and was granted a severance of the defendants' cases. Defendant Patton's trial was set for June 19, 2017, and just before the trial date, Defendant Swanier recanted his statement and refused to testify. The State filed a motion seeking to consolidate the defendants' cases for judicial economy, and Defendant Swanier's attorneys filed a motion to withdraw from representation. On the anticipated trial date, the trial court granted the motion to withdraw and appointed Defendant Swanier a new attorney. The State's motion for consolidation was delayed until June 23, 2017.

On June 21, 2017, Defendant Patton filed a "Motion to Remain Severed for Purposes of Speedy Trial," arguing that the State should not be allowed to delay "because strategy on prosecution changed." At the June 23, 2017 hearing, the trial court revoked the defendants' bond and the State's motion for consolidation of the cases was taken under advisement. In a written order issued August 14, 2017, the trial court found that the defendants were part of a common scheme or plan and thus the cases could be properly joined. The trial court then stated that if the State elected to prosecute the defendants jointly, however, it would be precluded from introducing Defendant Swanier's May 8, 2014 interview with the police implicating Defendant Patton. The State elected to try the defendants jointly and the cases proceeded to trial on the scheduled October 2017 date.

We find no evidence in the record to support the Defendant Patton's assertion that the State intentionally delayed the trial of this case to gain a tactical advantage over the Defendant. The continuances granted in this case were appropriate in light of the circumstances. Thus, the reason for the delay is neutral.

A defendant's assertion of his speedy trial right, while not required, is "entitled to strong evidentiary weight." *Barker*, 407 U.S. at 531. Failure to assert the right ordinarily will make it difficult to prove that the right has been denied. *Id*. Defendant Patton asserted his right to a speedy trial in June 2017, and the trial was held in October 2017. Thus, because he did assert his right to a speedy trial, this factor weighs in favor of Defendant Patton.

Finally, we consider the prejudice to Defendant Patton caused by the delay, in light of the interests protected by the speedy trial right. *Barker*, 407 U.S. at 532. The U.S. Supreme Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the

possibility that the defense will be impaired. *Id*. Defendant Patton asserts that the delay impaired his defense because the incriminating Facebook and rap video evidence would not have been discovered and used against him absent the delay. Based upon the record, it appears the State discovered the Facebook and rap video prior to the original trial date, undercutting Defendant Patton's argument that it was the delay that allowed for the discovery of this evidence. Further, nothing in the record suggests that Defendant Patton's ability to present his defense was impaired by the change of trial date from June 2017 to October 2017.

Our review of the record reveals that the prejudice in this case, if any, is minimal. Although Defendant Patton may have been prejudiced to some degree by the Facebook and rap video evidence, the State's evidence against him was overwhelming. Mr. Walker testified about Defendant Patton's role in the crimes. GPS tracking data showed Defendant Swanier's vehicle within eighty feet of the shooting at the time of the shooting. Mr. Zanarippa's description of the suspects matched those of the defendants. Surveillance videos showed Defendant Patton with Defendant Swanier in the hours leading up to the crimes. The jury was presented with overwhelming evidence of Defendant Patton's role in the crimes.

While the delay was sufficient to trigger a *Barker* inquiry, Defendant Patton has failed to establish a meritorious claim for a speedy trial violation. Accordingly, he is not entitled to relief as to this issue.

## C. Cumulative Error

Lastly, Defendant Patton contends that the cumulative effect of the errors in this case deprived him of a fair trial. Having considered each of the issues on appeal and concluding that the trial court did not err, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.")

## III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE